**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| Andy T. Case, ) | Case No. 3:08CV1171 |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| Commissioner of Social Security ) | **MEMORANDUM DECISION** |
| ) | **AND ORDER** |
| Defendant. ) | |

The parties have consented to have the undersigned Magistrate enter judgment in this case. Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Appeals Council's final determination denying his claims for Child's Disability Insurance Benefits (CDIB). Pending are the parties' Briefs on the Merits (Docket Nos. 13 & 16) and Plaintiff's Reply (Docket No. 17). For the reasons set forth below, the Commissioner's decision is affirmed.

### I. PROCEDURAL BACKGROUND

Plaintiff applied for DIB on July 12, 2002 (Tr. 63-65). His claim was denied initially and upon reconsideration (Tr. 16). On September 16, 2005, a hearing was held on this matter before Administrative Law Judge (ALJ) Rita S. Eppler. Plaintiff, represented by counsel, Loretta Wiley, and Dr. W. Bruce Walsh, Vocational Expert (VE), appeared and testified (Tr. 251). The ALJ issued an

unfavorable decision on February 22, 2006 (Tr. 16-26). The Appeals Council affirmed the ALJ's decision thereby rendering the ALJ's decision the final decision of the Commissioner (Tr. 4-6).

## II. FACTUAL BACKGROUND

**A.     Plaintiff's Testimony**

At the time of the hearing, Plaintiff was 28 years of age. He weighed 240 pounds and was 6' tall. Plaintiff completed the eleventh grade in special education (Tr. 259). His spouse was employed outside the home as a state-tested nurse's aide. (Tr. 260). Her income was the sole source of support for the family (Tr. 266). Consequently, Plaintiff was the care giver for the couple's six children.

Plaintiff had a current commercial driver's license. He drove only to take his children to the park or to visit his grandfather (Tr. 263, 264). Although his comprehension was sometimes limited, Plaintiff was literate (Tr. 264-265).

Plaintiff claimed that he smoked a pack of cigarettes every two days and consumed alcohol occasionally (Tr. 265). In fact, upon arising, he went outside to smoke (Tr. 266). He then played with his children, read to them and watched television. Plaintiff claimed that he played Solitaire, X-Box with his children and built car models (Tr. 268). Occasionally, he fished (Tr. 287). Plaintiff swept, mopped, washed dishes, cleaned, folded clothes and cleaned (Tr. 267). He and his spouse shared the duties of caring for the lawn (Tr. 268).

During a typical day, Plaintiff was able to bathe and groom himself. He took naps averaging an hour in length daily. He generally retired between 11:00 P.M. and 11:30 P.M. His sleep was subject to interruption, however, as the couple had  three month old twins (Tr. 269).

Plaintiff's ability to stand was limited to twenty minutes at one time. During the entire day, he could stand until such time as his legs started to bother him (Tr. 270, 271). He could sit for 45 minutes

at one time. He estimated that he could sit for 45 minutes six to seven times per day. The amount he could lift was limited to the weight of the twins or two gallons of milk (Tr. 271, 272).

Plaintiff was last employed in October 2001 (Tr. 272). His most recent employment was as a truck driver (Tr. 273). He sat the entire time, never having to unload the rig (Tr. 276, 277). He quit because his leg "bothered" him (Tr. 274). Plaintiff was also employed for six months as a gas station attendant (Tr. 274). In this capacity, he exercised a sit/stand option, sitting for ten minutes four to five times every hour (Tr. 277, 288). Prior to that, Plaintiff worked as a cleaner, a cable installer for three months, cook, laborer and maintenance worker (Tr. 276, 279). As a laborer, he was required to lift up to 50 pounds (Tr. 280). He quit all of these jobs either because he was bored or he did not have transportation (Tr. 275, 276). .

Plaintiff could work after he underwent knee surgery. After surgery, Plaintiff was plagued with edema and severe pain. He could not squat, kneel or walk as much as before surgery, and he could not stand for six hours in an eight-hour workday (Tr. 282, 283, 284). To relieve the pain and swelling, Plaintiff sat for at least one hour and elevated his leg three to four times per day (Tr. 283). Plaintiff was not taking any medications (Tr. 270).

In addition, Plaintiff suffered monthly mood swings, crying spells and feelings of sadness (Tr. 286). Plaintiff was not undergoing counseling (Tr. 270).

**B.      VE's Testimony**

The VE classified Plaintiff's past relevant work as follows:

(1)     a truck driver, a cook and a gas station attendant were considered light, semi-skilled work,
(2)     a cleaner and a cable installer were considered light, unskilled work, and
(3)     a carpet center employee was considered medium, unskilled work (Tr. 290).

An individual of Plaintiff's age, education and past work, with an ability to lift 25 pounds frequently, 50 pounds occasionally, sit six hours and stand/walk a combination of six hours in an eight-hour workday and occasionally doing work that involves ladders, stooping and crouching, could perform Plaintiff's past work as a truck driver, cleaner, cable installer, short order cook and gas station attendant as Plaintiff performed them. If the hypothetical plaintiff were limited by a deficit in concentration, attention and immediate memory, moderate impairment in performing repetitive tasks requiring close attention or concentration, the jobs as over-the-road truck driver, a short order cook and gas station attendant would be eliminated. The percentage of other work that was consistent with these limitations included 70% of the light, unskilled work in the service delivery area or about 14,000 light, unskilled work, 800 packer positions, 500 hand packer positions and 400 inspection positions (Tr. 292, 293, 294).

If Plaintiff's testimony were deemed credible and supported by the evidence, Plaintiff could not perform his past relevant work. The pain described by Plaintiff would limit his ability to sit, stand, walk and lift. The swelling of his legs and need to elevate them would limit competitive work. His depression, mood swings and problems with attention and concentration would be problematic (Tr. 294).

### III  MEDICAL EVIDENCE

Characterized as developmentally disabled, Plaintiff was exempt from taking ninth grad proficiency tests (Tr. 123, 126). During his ninth grade year, Plaintiff earned five credits. During his sophomore year, Plaintiff earned five and a half credit hours. In his junior year, Plaintiff earned six credit hours (Tr. 122). Plaintiff dropped out of school during his senior year on December 13, 2006 (Tr. 121, 122).

Plaintiff was treated on February 5, 2001, for pain that had lasted for three days (Tr. 144). On February 5, 2001, he was prescribed medication to treat symptoms of a urinary tract infection (Tr. 146). There was no x-ray evidence of acute cardiopulmonary disease. A few rounded calcific densities were discovered in the right upper quadrant of Plaintiff's abdomen (Tr. 147). There was evidence that the protein and the proportion of blood volume that is occupied by red blood cells exceeded that of the normal range (Tr. 148). Yet the substance in the bile was lower than the required range (Tr. 149).

Plaintiff presented to the hospital on February 14, 2001, for treatment of pain, vomiting, diarrhea and sore throat (Tr. 150). He was diagnosed with an acute viral syndrome and advised to quit smoking (Tr. 151). He was treated for back/neck and head pain on March 2, 2001 (Tr. 153). After being diagnosed with multiple contusions, Plaintiff had a muscle relaxant and pain reliever prescribed (Tr. 155). Although the clinical information showed a normal left knee, Plaintiff was prescribed a pain reliever for left knee strain on June 12, 2001 (Tr. 159).

On June 12, 2002, Dr. Stephen J. Pomeranz, M. D., a radiologist, concluded that Plaintiff suffered from patellofemoral arthrosis and "runners knee" with patellar displacement (Tr. 230, 232). Two days later, Dr. John J. Duggan confirmed that Plaintiff had osteoarthritis of the patellofemoral joint in both knees and medial compartment osteoarthritis in the right knee (Tr. 164). He performed surgery on June 26, 2002, repairing a torn medial meniscus of the left knee (Tr. 218). During the follow-up care in July, Plaintiff was making progress, albeit slow (Tr. 173, 174). The left foot was examined on July 20, 2004, showing no fracture or dislocation (Tr. 233). In August 2002, Dr. Duggan determined that clinically there was good mobility in the knee. The doppler showed evidence of a blood clot which was treated with an anticoagulant (Tr. 171, 172, 210). After four months of anticoagulant therapy, Dr. Robert A. Wheeler, M.D. stopped the treatment (Tr. 213).

On August 28, 2002, Dr. Walter A. Holbrook, a family practitioner, opined that Plaintiff could occasionally lift and /or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday and engage in unlimited pushing and/or pulling (Tr. 166).  Climbing using a ladder, rope or scaffold was contraindicated.  Plaintiff was limited to occasionally climbing using a ramp or stairs, stooping, kneeling, crouching or crawling (Tr. 167).  No visual, communicative, environmental or manipulative limitations were noted (Tr. 167-169).

Plaintiff attended six sessions of physical therapy in July and August 2002 (Tr. 228).  He was discharged for lack of attendance (Tr. 221-225).

On February 3, 2003, Dr. Albert E. Virgil, Ph.D., J.D., a clinical psychologist, administered the Reading Comprehension Subtest of the Peabody Individual Achievement Test (PIAT) and the Wechsler Memory Scale III.  The results showed that Plaintiff, a 25-year-old male, had a reading comprehension ability score at the 3.4 grade level and his intellectual and memory functions were within the mental retardation levels (Tr. 182, 183).  Dr. Virgil diagnosed Plaintiff with a dysthymic disorder, estimated borderline intellectual functioning and moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 184).

On February 10, 2003, Drs. Robert L. Gaffey, Ph.D., and Thomas T. Vogel, M.D., conducted a psychiatric review and physical residual functional capacity assessment, respectively.  Dr. Gaffey diagnosed Plaintiff with a dysthymic disorder and borderline intellectual functioning (Tr. 188, 189). Plaintiff had mild limitations in his restriction of activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence or pace (Tr. 195). Further, he opined that Plaintiff had moderate limitations in his ability to, *inter alia*, remember locations and work-like

6

procedures, understand and remember detailed instructions, carry out detailed instructions, sustain an ordinary routine without special supervision, accept instructions and respond appropriately to criticism (Tr. 199).

Dr. Vogel opined that Plaintiff could occasionally lift and /or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk about six hours in an eight-hour workday and sit about six hours in an eight-hour workday and engage in unlimited pushing and/or pulling (Tr. 202). Climbing using a ladder, rope or scaffold could be done occasionally. Plaintiff was limited to occasionally stooping and crouching or crawling (Tr. 203). No visual, communicative, environmental or manipulative limitations were identified (Tr. 203-204).

In December 2003, Dr. James M. Nieman prescribed a six-week strengthening regimen designed to improve bilateral knee pain and weakness (Tr. 220).

On July 19, 20 and 22, 2004, Plaintiff was examined for complaints related to left leg pain and swelling. Plaintiff was treated for a recanalized blood clot (Tr. 206, 208, 209). Except for some mild thickening in the distal portion of the left superficial amoral vein, there was no evidence of acute deep venous thrombosis (Tr. 207, 208). X-rays of Plaintiff's left tibia and fibula were normal (Tr. 209).

Dr. Robert A. Wheeler interpreted the results from diagnostic data which showed normal electrical activity of the heart on February 23, 2005 (Tr. 250). Dr. Ronald R. Magee conducted a clinical examination on February 24, 2005, and recommended a work-up to assess the long term effects of anticoagulation (Tr. 237-238). Apparently the work-up showed the presence of antithrombin used to help blood clotting as well as an abnormal tendency to form blood clots (Tr. 235). Dr. Magee noted a reduction in edema but no sign of impending tissue breakdown on May 10, 2005 (Tr. 235). He also

found that the average concentration and the average mass of hemoglobin in Plaintiff's blood exceeded the normal ranges (Tr. 241).

Dr. Magee referred Plaintiff's case to Dr. Abbas Khalil, M.D., FACP, a clinical assistant professor of medicine at the Medical College of Ohio, who opined that Plaintiff's specific disorder of blood clotting was common in 5% of the white population. Dr. Khalil did not recommend anticoagulation treatment absent recurrent deep vein thrombosis or pulmonary embolism. He planned to order tests (Tr. 249).

## IV. STANDARD FOR DISABILITY

To qualify for DIB, a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Act. 42 U. S. C. § 423 (Thomson Reuters/West 2009). "Disability" as defined in the Act, denotes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context)).

To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that result in death or can be expected to last for a period of twelve months and the impairment renders the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. § 423(d)(2) (Thomson Reuters/West 2009). Regardless of the actual or alleged onset of disability, the claimant is entitled to benefits beginning with the first month covered by the application in which the claimant meets all of the other requirements for entitlement. 20 C. F. R. § 404.316 (Thomson

Reuters/West 2009).

To determine disability, the Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520 (a)(4) (Thomson Reuters/West 2009). First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. 20 C.F.R. § 404.1520 (a)(4) (i) (Thomson Reuters/West 2009).

Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. 20 C.F.R. § 404.1520 (a)(4) (ii) (Thomson Reuters/West 2009).

Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments. 20 C.F.R. § 404.1520 (a)(4) (iii) (Thomson Reuters/West 2009). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. § 404.1520 (a)(4) (iii) (Thomson Reuters/West 2009).

Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. 20 C.F.R. § 404.1520 (a)(4) (iv) (Thomson Reuters/West 2009).

Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. 20 C.F.R. § 404.1520 (a)(4) (v) (Thomson Reuters/West 2009).

During the first four steps, the claimant has the burden of proof. *Walters v. Commissioner of Social Security*, 127 F. 3d 525, 529 (6th Cir. 1997) (*citing Young v. Secretary of Health and Human*

*Services*, 925 F.2d 146, 148 (6th Cir. 1990); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987)). This burden shifts to the Commissioner only at Step Five. *Id*.

## V. ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made the following findings:

` 1. Plaintiff met the nondisability requirements for a period of disability and DIB as set forth in the Act, and was insured for benefits through February 22, 2008.

2. Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability.

3. Plaintiff had severe impairments of degenerative joint disease of the left knee, status post arthroscopy due to a torn medial meniscus, peripheral vascular disease, status post thrombosis, dysthymic disorder and borderline intellectual functioning. However, his impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. Plaintiff's allegations regarding his limitations were credible to the extent that he had severe impairments. Because of significant inconsistencies in the record as a whole, Plaintiff's testimony was not credible to show that he was incapable of all work activity at any exertional level.

6. Plaintiff had the residual functional capacity to lift/carry 50 pounds occasionally and 25 pounds frequently, stand/walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, occasionally climb ladders/ropes/scaffolds, stoop, crouch and perform simple, routine work but with a moderate impairment in the ability to attend and concentrate.

7. Plaintiff was able to perform his past relevant work as a cleaner and a cable installer. These jobs did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity. Plaintiff's medically determinable impairments did not prevent him from performing his past relevant work.

8. Plaintiff was not under a "disability" as defined by the Act, at any time through February 22, 2006.

(Tr. 25-26).

## VI. STANDARD OF REVIEW

This Court can conduct judicial review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security,* 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). The decision must be affirmed if the ALJ's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision. 'Substantial evidence' means 'more than a mere scintilla. *Foster v. Halter,* 279 F.3d 348, 353 (6th Cir. 2001). It means such relevant evidence as a reasonable mind might accept. ' " *Id.* (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2428 (1983) (*quoting Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). The court must defer to an agency's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Id.* (*citing Key, supra*, 109 F.3d at 273).

## VII. DISCUSSION

The sole issue before the Court is whether there is substantial evidence to support the ALJ's finding that Plaintiff did not meet 12.05C of the Listing. Plaintiff claims that his impairment meets Listing 12.05C since his intelligence quotient score was in the 60s, he had deficits in adaptive functioning and his physical impairments were severe. Plaintiff argues further that the ALJ erred in finding that his impairment did not meet 12.05C of the Listing as there is no evidence to the contrary. Defendant contends that the ALJ's conclusion is supported by substantial evidence and is legally sound. The ALJ reasonably weighed the evidence of record and found that Plaintiff had borderline intellectual

functioning, not mental retardation; thus, he did not meet all the requirements of 12.05C of the Listing.

Mental retardation, defined at 12.05 of the Listing, refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports an onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in C are satisfied. Subsection C requires a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C. F. R. Pt. 404, Subpt. P, App. 1, 12.05C (Thomson Reuters/West 2009).

The ALJ acknowledged that Plaintiff's intellectual capacity was within the extremely low/intellectually deficient range. However, he was not persuaded that Plaintiff fully cooperated with the consultative examiner that measured his intellect or that his score was indicative of retardation. He considered that Plaintiff read the newspaper, did not need job coaching, had performed semi-skilled labor and quit several jobs because of boredom (Tr. 21). This evidence allowed the ALJ to conclude that Plaintiff did not have a relative inability to effectively interact with society or care for himself. Even if the ALJ assumed that Plaintiff had deficits in adaptive functioning, absent from the record is medically determinable clinical or diagnostic evidence that such deficits arose prior to his 22nd birthday. Dr. Virgil's examination does not go far enough to indicate an onset date of Plaintiff's impairment at any time other than at 25 years of age. The ALJ's decision that Plaintiff's impairment does not meet or equal 12.05C of the Listing is supported by substantial evidence. Consequently, the Magistrate affirms the ALJ's decision.

## VIII.  CONCLUSION

For the above reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

                                                 /s/ Vernelis K. Armstrong
                                                 United States Magistrate Judge


Date: September 9, 2009